previously announced and the times will be as allotted to counsel. The first case today is number 161246, United States v. Christopher Coombs. Thank you, your honor. May it please the court, my name is Jim Hughes and I represent Chris Coombs. On October 31, 2014, Mr. Coombs was returning to his home in San Francisco, California, and he was visited by his wife, Mrs. Coombs. As he neared his house, he was accosted by a police officer, disguised as a postal worker, delivering a package to him. He asked him to sign it, Mr. Coombs signed it, and upon signing it, about a half a dozen police officers converged around Mr. Coombs. Apparently some had guns showing, none were drawn. Chris was taken to the ground, or as one of the witnesses says, you could say thrown to the ground. He was handcuffed while face down on his stomach. This occurred in front of his home and his neighbors. In the midst of this highly charged situation, Mr. Coombs was asked to read and sign a consent form to search his residence. In addition to this, the judge took judicial notice of his 2008 PSI, paragraphs 30 and 31, that described his physical infirmities, which include a history of back pain, arthritis in his spine, herniated discs, and other injuries. Well, your honor, I don't have a good answer for that. I can't say that there was an unyielding belief that a mistake had been made based on this. But I submit that he did clearly err. Well, but those two statements are contradictory. Yes. The clear error test requires to show clear error that we have an unyielding belief that a mistake has been made. Thank you, your honor. Yes. Let me change that. I do submit that he clearly erred. And it's a question of fact examining the totality of the circumstances. And when he was thrown down, his back problems, his pain, his mental health issue with anxiety and depression, I believe that he did clearly err. Well, yeah, but the district court took that all into account and credited instead the officer's testimony that he was calm and responsive, that a significant interval elapsed between the time he read the consent form and the time he signed it, that there was no show of force in terms of the officers didn't have their weapons drawn or anything like that. I mean, the district court actually saw these witnesses and heard them and formed a judgment as to their credibility. And I'm struggling for a basis on which we can say that that judgment was so far off that it would not survive under the clear error standard, which is a highly deferential standard. Yes, your honor. Well, there's no evidence that he knew of his right to refuse. Well, how can you say that? Because he signed a statement that says I have been informed of my right to refuse. That's a good point. I don't have anything extra from my argument here, your honor. This is all that I have on the clear error standard. Is there anything else you'd like to say? Yes. Can I move to the next issue? Yes. In terms of the Miranda issue in the Westbrook police station, there again I'm arguing these physical disabilities. I understand the clear error. It's a high hurdle. The interview was 45 minutes long. He was interrogated by two police officers. There was no sign Miranda and it was not videotaped. But there's nothing in the record or in your brief for that matter that constitutes a denial that he was advised of his Miranda rights. All you do in your brief is point out that there was no signed waiver of Miranda rights and no videotape of him being advised of Miranda rights, neither of which is required. That's true, your honor. But there's nowhere in the record that either he or you on his behalf deny that he was administered his Miranda rights. Yes, your honor. That's true. But I was just pointing that videotape out in the signed Miranda because that is done so often. It's common. And when it's not done, it kind of raises questions. I would fall back on his mental and physical disabilities, but that's pretty much all I have for that argument too. And your honor, I would go to the sentencing issue. In terms of my argument about the supervised release on count one being five years, I agree with the government on that. I withdraw that argument. In terms of the sentence. So that you no longer challenge the five-year supervised release term on count one. That is correct, your honor. Okay. Thank you. You're welcome. And your honor, also with respect to the sentencing, I'm arguing here that it was substantively unreasonable because the court abuses discretion when taking into account all the circumstances. Now, on the supervised release violation, he was given 12 months and a day. And that was run consecutive with the new charge of 60 months. And I'm submitting that the sentence should have been concurrent and there should have been a variance given. Now, here again, I do understand there is a high hurdle here. But I believe we need to look at the totality of the circumstances. 18 U.S.C. 3584 favors concurrent sentences imposed at the same time. The supervised release violation was the basis of that was this criminal conviction. And that one supervised release violation also was the source of his three points for having a felony and two points for being on supervised release. Plus, it was a consecutive sentence. So it seems like a lot of overkill for that one charge. And then, your honor, in terms of the variance downward, the trauma and abuse he suffered as a youth, he was hit with a studded belt at age 14. He tried to commit suicide in his eighth grade. And he went through two stepfathers and three stepmothers. What do you say to the judge's intimation that he already received, in effect, a break for those same considerations in the relatively light sentence he got on the first set of offenses? Well, that is true, your honor. He did get a break on that. And that was the same judge, Judge Singleton. But here, in this case, when you look at the totality of the circumstances, he accepted responsibility. And not only that, there was an impact on his family members, his three stepchildren. I mean, you've argued that. Thank you. Thank you, your honor. Thank you very much. Good morning, Your Honor. Renee Bunker on behalf of the United States. May it please the Court, I'll start just briefly with the sentencing issues. Let's face it, Mr. Coombs got a great deal the first time around. He got a 15-month sentence, which was a substantial downward departure in variance from the guideline range at that time. And it was certainly not an abuse of discretion in light of the new criminal conduct, the multiple e-mails seeking bath salts, both PVP and PHP, alpha PVP and alpha PHP, from this farm tech lab in China that constituted new offense conduct, and the obstruction charge, of course, asking his wife to delete evidence from his Gmail accounts. It was certainly within the Court's discretion. And as the Court indicated, Judge Singel explicitly said, look up, Mr. Hughes, it's appropriate that you put all of this stuff in front of me again. I read it all and I considered it all in 2009. And it's certainly within the Court's discretion to weigh it less favorably towards Mr. Coombs during these 2016 proceedings. So unless there are questions on the sentence, I'll proceed, I'll work backwards and discuss the Court's very supportable ruling that Mr. Coombs voluntarily consented to the search of his apartment. As the appellant has conceded, there were no weapons drawn there, and there were no threats, there were no shootings taken to the ground and handcuffed behind his back. Judge Selye, I think, highlighted this will boil down basically to the District Court's credibility findings. The District Court explicitly credited Agent Moulton and Officer Brian Olson and their testimony regarding the nature of the takedown. Mr. Coombs was then escorted by a few agents over to the exterior of Moulton's vehicle. He was told what was going on. He was, according to Agent Moulton, very cooperative. In fact, he told Agent Moulton he wanted to help. And Agent Moulton, although not required to get written consent, the law is clear, and not required to advise a detainee of his right to refuse consent, as Judge Keada pointed out. Here we have the consent form at page 187 of the appendix, which makes clear, coupled with the agent's testimony, that Agent Moulton did both. He got Mr. Coombs' written consent, and there was zero indication, notwithstanding the complaints and the diagnoses that have come up both in 2009 and 2016, there was zero evidence of any, first of all, any evidence that the agents knew of Mr. Coombs' physical or mental health issues, let alone that Mr. Coombs was exhibiting symptoms of them, and certainly not any evidence of police overreaching by exploiting any of those conditions. To the contrary, the evidence was that Mr. Coombs gave every indication that he understood his rights and agreed with that bold statement in the form that he was waiving them voluntarily without any coercion. And there is nothing in the record to contradict that. Ms. Funker, we've had a number of bath salts cases from the state of Maine, including one that led to a civil lawsuit against the city of Augusta and how it handled someone who was intoxicated with bath salts. Am I correct in my perception that this actually is a major problem in Maine? Judge Lynch, you are absolutely correct. I was sort of, the appellants repeated, in the record you will see the repeated references to this nonviolent drug trafficking. This is Coombs' second federal drug trafficking crime, and although maybe the mere distribution of bath salts, be they in the alpha PVP form or their nearly identical alpha PHP form, have certainly had violent and serious impacts. And is China a common source for importing bath salts? Both agents in this case, both of the appeals to Agent Rodriguez in the first affidavit and Agent Moulton in both of his affidavits have indicated that based on their training and experience, it's certainly typically or frequently they are ordered overseas from China. And so I'm sure there are other sources, but it is certainly a serious problem in Maine with dangerous and some violent results. And for that reason, and I might add this to the extent Mr. Hughes didn't go there, but to the extent Mr. Coombs was begging sympathy that this was not, I didn't know this was illegal. The record certainly shows that, look at his emails, I'm sure the court will look carefully at the record. His May 15, May 14, 2014 email, going overseas, looking for APVP or similar products. He knew exactly what he was trafficking in, and he had multiple shipments of alpha PVP and then alpha PHP, and he knew what it was doing to his apparently happy Maine customers with some pretty serious effects. I'm just curious, how do you go about it? Do you Google? Do you put in the name of the chemical and then you order it from China? Is it as simple as that? Having not personally gone about it, I know that on this record, it happens. People go online. I'm sure there's a lot of talk in the community about where to get it. You can go online. There's often a front, and I thought it was interesting that Mr. Coombs mentioned that this, he was ordering research chemicals for this friend that he knew by a nickname. But the evidence in this was that he was going online. He was contacting a pharma tech company in China saying, hey, I'm interested in APVP and cannabinoids. What do you recommend? That's in January of 2014. By May of 2014, he's looking for a new supplier, again, online. So it is as easy, unfortunately. It does appear to be as easy as that. And that gets to how important it is for the officers acting in good faith to intercept a suspicious package with this amber polycarbonate identified as polycarbonate. But the contents stored within a pouch, within a pouch, within a plastic baggie, was this amber crystal rock-like substance. And certainly they acted in good faith. Ms. Duncan, there's one thing in this record that did jump out at me, and that's apparently the officers had a conversation, Moulton and Olson, and specifically decided not to use the recording equipment that was sitting right there in the Westbrook station when they took the interview and the confession. And the record indicates that Moulton basically dissuaded Olson from doing it by saying that on the federal side they usually don't record confessions. Is that the case? I saw that in the record as well, Judge Kaye. And I'm not sure I would agree that Agent Moulton dissuaded officers. The record, there was a conversation according to Olson's testimony. He says, we discussed it, and I'm not sure when the discussion occurred from this record. And I think according to Olson's testimony, Agent Moulton said their current practice, actually their then practice, I don't know what Homeland Security's current practice is, was that they opted not to record it, but I think that is. Well, in this record, it's probably not going to make any difference, but can you think of any appropriate reason why the officers would not have used the recording equipment that was right there, particularly in a case where they chose also not to get a written waiver of Miranda rights? I think historically there are a lot of reasons people think that perhaps a defendant might be less than forthcoming. I know the trend is to increasingly videotape post-arrest interviews at a station, and so I certainly understand where you're coming from, Judge Kaye. And I don't know what the, again, I don't know the current policy of Homeland Security, and it's not particularly fleshed out in this case in terms of, and I don't think it's particularly, going back to, you may say it added to the Miranda problem. I agree, had it been on a video, we could all watch the video and see what happened. That said, we frequently have Miranda. I don't think that necessarily minimizes the strength of the Miranda waiver here, with two agents testifying. But the presence of the videotape might minimize appeals like this. I have had cases back-to-back where we had a video and it was challenged. Why did they haul them down to the PD to do the video? And flip side, I agree with you, though. A video can certainly help answer some questions that we are left questioning. We've also, within the last year, written that having the video can actually increase the prosecution's ability to do an in-courtroom witness ID and to rely on a witness ID, because the jury can see if the person's, how certain the person is or not. That's correct. I've read that. And I have nothing to add except I agree that a video can be a very useful tool, and there was not, for whatever reason, the record is not robust in that sense, but there was that discussion that Agent Olson, I mean Officer Olson testified that they had some sort of discussion and apparently decided not to video it. So I can't. Thank you. That we ask that you affirm. Thank you very much. Thank you both. Safe trip back.